## APPEAL OF GEORGE A. SPRINGMEIER CO.

Docket No. 4213.   Promulgated April 2, 1927.

The petitioner was not a personal service corporation during the years 1919 and 1920.

*James B. O'Donnell, Esq.*, for the petitioner.
*J. Arthur Adams, Esq.*, for the Commissioner.

This is an appeal from the determination of deficiencies in income and profits taxes for the years 1919 and 1920 in the amounts of $3,455.84 and $2,088.97, respectively. The sole issue is the petitioner's right to classification as a personal service corporation for the years involved.

### FINDINGS OF FACT.

For approximately twenty-five years prior to January 1, 1917, George A. Springmeier had been engaged in business at Cincinnati, Ohio, as a factor or agent representing certain manufacturers of shoe factory supplies.

On or about January 1, 1917, in order to perpetuate his business and to establish other members of his family therein, he caused the petitioner to be incorporated under the laws of the State of Ohio. The total capital stock authorized and outstanding during the years 1919 and 1920, was $10,000, divided into 200 shares of $50 par value, and was held by George A. Springmeier and his brothers and sister, as follows:

| Stockholder. | Shares. | Office |
|---|---|---|
| George A. Springmeier{Jan. 1, 1919, to Jan. 10, 1919 | 165 | President and general |
| {Jan. 10, 1919, to Dec. 31, 1920 | 160 | manager. |
| Harry Springmeier | 10 | |
| E. J. Springmeier | 10 | Treasurer. |
| Lee Springmeier | 10 | |
| Loretta Springmeier{Jan. 1, 1919, to Jan. 10, 1919 | 5 | Secretary. |
| {Jan. 10, 1919, to Dec. 31, 1920 | 10 | |

The five shares passing from George A. to Loretta Springmeier in January, 1919, had been acquired by him from the estate of an original stockholder and employee named Clem Pelzer.

The amount of the capital stock was arbitrarily fixed.

George A. Springmeier originally had short-term contracts as Cincinnati representative of the manufacturers whose products he sold. Some of these contracts had been renewed and some apparently had simply been continued by the parties. In payment for the 160 shares of the petitioner's stock originally issued to him, George A. Springmeier turned over to it his agency contracts and such other

rights as he had to represent shoe factory supply manufacturers. In addition he paid in certain office equipment, etc., of small value. In payment for the stock issued to them, the other stockholders gave notes to be paid by the crediting of dividends.

The petitioner's principal source of income was from commissions on sales. Manufacturers whom it represented shipped small quantities of their products to it for warehousing near the territory in which they were to be sold. When the petitioner made a sale the customer was shipped sufficient goods from this "Cincinnati stock" to cover immediate needs. On notice from the petitioner the manufacturer then filled the balance of the order. The entire order was invoiced by the petitioner on the billhead and in the name of the manufacturer, who was furnished a copy thereof. The petitioner kept another copy for its record of the transaction.

The customer remitted directly to the manufacturer. The petitioner was not a guarantor of the accounts nor an insurer of the goods.

At the close of each month the manufacturers computed the petitioner's commissions, averaging about 5 per cent, and shortly thereafter paid them.

Freight, drayage, etc., on the small quantities of goods so handled by the petitioner were either prepaid or refunded.

Among the goods sold by the petitioner were "box toes" made by the Beckwith Box Toe Co., of Dover, N. H. The Beckwith Company refused to warehouse any quantity of its product with the petitioner on an arrangement similar to that of other manufacturers as described above, because frequent style changes would force it to accept losses on such goods.

During 1919 box toes manufactured in Cincinnati were being offered to the trade by a competitor. The petitioner, to hold its business with customers unbroken in any line, had to be able to furnish service on deliveries of box toes equal to that of its competitors. To accomplish this purpose it became a jobber of box toes.

In order to avert losses such as were contemplated by the Beckwith Company when it had refused to warehouse with the petitioner, the stock of box toes was kept as small as practicable. Temporary needs of a customer were filled from the petitioner's "jobbers stock" and the balance of the order, on notice by the petitioner, was shipped by the Beckwith Company and billed in its own name. The petitioner was granted a 10 per cent discount on its "jobbers stock" and a 5 per cent commission on other box toe sales. The petitioner paid drayage, etc., on its stock of box toes.

The petitioner also did some jobbing in fibre heels, leatherol, cement and cotton stays.

Fibre heels were delivered by the manufacturer on the petitioner's order, directly to the customer. The manufacturer then billed the Springmeier Company, which turned the invoice over to the customer for direct payment to the manufacturer. The petitioner in some manner not disclosed derived a profit, but competition of another manufacturer caused the company in 1920 to stop jobbing fibre heels.

Leatherol is a preparation for softening leather, making it more flexible and comfortable to wear in shoes. It was made under a formula owned by a Cincinnati man and sold on a royalty basis under the Springmeier trade name.

Cement was bought in Auburn and shipped to Rochester, N. Y., where it was sold under the Springmeier trade name by a leather salesman, who carried it and leatherol as side lines, on a commission basis.

During 1919, the petitioner bought some cotton stays for the purpose of turning a profit on a rising market.

The total jobbing sales of the petitioner were:

| Article. | 1919. | First half 1920. | Second half 1920. | Total 1920. |
|---|---|---|---|---|
| Box toes | $38,116.48 | $30,000.11 | $5,951.61 | $35,959.72 |
| Fibre heels | 16,252.47 | 2,100.35 | 28.95 | 2,135.30 |
| Leatherol | 6,168.75 | 4,246.45 | 830.12 | 5,076.57 |
| Cement | 1,247.85 | 3,252.08 | 5,242.68 | 8,494.76 |
| Cotton stays | | 5,172.35 | | 5,172.35 |
| Unexplained | | | 599.31 | 599.31 |
| | 61,785.55 | 44,777.34 | 12,660.67 | 57,438.01 |

The cost of jobbing stock and gross profits from sales thereof, so far as shown, and commission sales and gross profits therefrom, were:

| Year. | Jobbing stock. | | Commission sales. | |
|---|---|---|---|---|
| | Cost. | Gross profits. | Sales. | Gross profits. |
| 1919 | Not shown. | $8,815.17 | $464,077.38 | $26,470.96 |
| 1920 | $57,438.01 | 4,910.85 | 499,978.91 | 26,826.38 |

The petitioner also received income in the form of interest in the amounts of $449.56 during 1919, and $120 during 1920.

Total business expenses, as shown by petitioner's return, exclusive of salaries, were: 1919, $5,574.03; 1920, $11,705.25. These expenses included the maintenance of branch offices at Rochester and Chicago during 1919, and at Rochester during 1920.

For 1919, actual expenses have been offset to the extent of $1,020 by crediting payments of $300 and $720 as "rent" paid by two manufacturers the petitioner represented.

Salaries paid stockholders and salaries and commissions paid employees, were:

| Year. | Stock-holders. | Employees. |
|---|---|---|
| 1919 | $11,800.00 | $2,910.00 |
| 1920 | 13,960.50 | Not shown. |

The petitioner's balance sheets were:

| | Jan. 1, 1919. | Jan. 1, 1920. | Dec. 31, 1920. |
|---|---|---|---|
| **Assets:** | | | |
| Cash | $2,984.23 | $2,947.02 | $169.47 |
| Notes receivable | 2,000.00 | 2,600.00 | 3,850.00 |
| Notes receivable—stockholders | | 1,000.00 | 1,000.00 |
| Accounts receivable | 6,397.42 | 13,339.86 | 14,133.74 |
| Geo. A. Springmeier | | 1,000.00 | 9,102.56 |
| Liberty bonds | 7,500.00 | 10,000.00 | 8,180.00 |
| Agency contract | 8,000.00 | 8,000.00 | 8,000.00 |
| Inventory | | 11,151.96 | |
| | 26,881.65 | 49,038.84 | 44,435.77 |
| **Liabilities:** | | | |
| Accrued liabilities | 54.02 | | |
| Accounts payable | | 7,271.62 | 95.01 |
| Notes payable | | 4,529.91 | |
| Capital stock | 10,000.00 | 10,000.00 | 10,000.00 |
| Surplus | 16,827.63 | 27,237.31 | 34,340.76 |
| | 26,881.65 | 49,038.84 | 44,435.77 |

"Notes receivable" represent loans to friends outside the course of business and are really the personal transactions of George A. Springmeier carried through the company's books for convenience.

"Accounts receivable" represent unpaid commissions and trade balances. The commissions would be paid approximately 10 days later.

"Liberty bonds" represent the petitioner's investment of its surplus. They account for the income received as interest.

The item "Agency contract" relates to the contracts paid in by George A. Springmeier for his stock.

The inventory at January 1, 1920, represents principally the stock of box toes. The inventory was abnormally large at that time of the year because of the possibility of transportation delays due to the weather if the petitioner had depended on having orders filled direct by the manufacturer at Dover.

Late in 1920, the jobbing lines of the petitioner were taken over by George A. Springmeier personally. This accounts for the absence of an inventory at December 31, 1920.

"Accounts payable" represent principally payment due the Beckwith Company for box toes. The usual credit extension on the Beckwith account was sixty days.

"Notes payable" represent bank loans which would have been unnecessary had the petitioner cared to sell its Liberty bonds. The bonds were pledged as collateral for the loans.

"Surplus" was the accumulation of undivided profits since the petitioner's incorporation.

With the exception of E. J. Springmeier, who was in the Army for five months and unemployed for one month during 1919, all of the stockholders were actively engaged in the business and devoted their entire time to it during 1919 and 1920. George A. Springmeier secured approximately 80 per cent of the petitioner's sales. His brothers were also salesmen, and Loretta Springmeier was bookkeeper and office manager.

OPINION.

MARQUETTE: Under section 200 of the Revenue Act of 1918, a personal service corporation is one " whose income is to be ascribed primarily to the activities of the principal owners or stockholders who are themselves regularly engaged in the active conduct of the affairs of the corporation and in which capital (whether invested or borrowed) is not a material income-producing factor; but does not include any foreign corporation, nor any corporation 50 per centum or more of whose gross income consists either (1) of gains, profits or income derived from trading as a principal * * *."

The necessity for the concurrence of the statutory elements above set forth to entitle a corporation to personal service classification has been so often discussed by the Board that we believe nothing would be gained by repetition in this instance. *Appeal of Bryant & Stratton Commercial School, Inc.*, 1 B. T. A. 32; *Appeal of Scheffler Hair Colorine Co.*, 1 B. T. A. 61; *Appeal of Cliver-Wright-Rainey Co.*, 2 B. T. A. 561. Determination of the classification depends in each instance on an issue of fact. *Appeals of Scheffler Hair Colorine Co* and *Cliver-Wright-Rainey Co.*, *supra*.

This petitioner contends that in the main its business was that of a commission merchant, that the jobbing was purely incidental and, referring to the box toes, was largely forced upon it by trade conditions. To a considerable extent our findings evidence these contentions to be facts. But we have held in *Appeal of Seaboard Mills, Inc.*, 5 B. T. A. 575, citing *Matteson Co. v. Willcuts*, 12 Fed. (2d) 447, that it was not the intention of Congress to grant corporations personal service classification when capital is found to have produced during the year a substantial amount of income, and further, that the

fact that capital was employed only in incidental activities of the corporation does not affect this viewpoint.

We believe that in the jobbing operations of the petitioner capital was a material income-producing factor, that it produced a substantial portion of the petitioner's income during the years involved in this appeal and, therefore, that the petitioner is not entitled to personal service classification.

*Judgment will be entered for the respondent.*